688 A.2d 933

**THE KNIGHTS AND LADIES OF SAMARIA**

v.

**BOARD OF EDUCATION OF CHARLES COUNTY.**

No. 427, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Feb. 6, 1997.

Lowell S. Lewis, Fort Washington, for appellant.

Edward S. Digges and Christopher C. Henderson, La Plata, for appellee.

Argued before MOYLAN, DAVIS and SONNER, JJ.

DAVIS, Judge.

The Knights and Ladies of Samaria (Knights) brought an action in the Circuit Court for Charles County on March 5, 1993, seeking a declaratory judgment that title to a sixteen and three-quarter acre parcel of land in Charles County had reverted to Knights (grantors) in June 1974, upon the closing of a school by the grantee-appellee, the Board of Education of Charles County (Board). After an unsuccessful attempt at mediation and four continuances, the circuit court (G.R. Hovey Johnson, J.) granted summary judgment in favor of the Board as to all claims on March 1, 1995. Knights appeals from the

grant of summary judgment, presenting questions for our review that we restate as follows:

I.  Did the circuit court err when it held that Knights' possibility of reverter extinguished by the operation of § 6–102 of the MD.CODE ANN., REAL PROP. (R.P.) (1957, 1994 Repl.Vol.)?

II.  Did the circuit court err when it held that Knights' action was barred by the time limitation of R.P. § 6–103?

III.  Is R.P. § 6–102 unconstitutional as applied?

IV.  Is R.P. § 6–103 unconstitutional as applied?

Although we answer the first question in the affirmative, and therefore do not reach the third question, our negative responses to the second and fourth questions result in affirmance of the circuit court judgment.

## FACTS

In 1921, Joshua Lodge No. 65 Independent Order Good Samaritans and Daughters of Samaria conveyed to the Board, by deed, sixteen and three-quarter acres of land located in Charles County. The 1921 deed states that the purpose of the conveyance was for the Board to establish a "Colored Manual Training School." The deed further specified that if the Board ever closed the school, the land would revert to Joshua Lodge No. 65.

The Board permanently closed the school in June 1974. By this time, Lodge No. 65 was no longer active.[1] On June 10, 1994, Knights incorporated as successor-in-interest to Lodge No. 65, intending to possess the land and construct a day care and senior citizens' center on the acreage. Whether Knights ever made a request for the Board to reconvey the property via confirmatory deed was contested in the pleadings, and the

---

1.  Whether the Lodge was merely inactive or actually defunct was the subject of some dispute in the pleadings; for purposes of ruling on the court's grant of summary judgment, we will assume that the Lodge was merely inactive.

trial court made no finding as to that issue; regardless, Knights sought, in the action brought below, to have the property declared its own by operation of the reverter clause in the deed. The circuit court found Knights' action barred by R.P. §§ 6–102 and 6–103. As Knights challenges both findings, we shall address *seriatim* the effect of §§ 6–102 and 6–103 on Knights' claim.

## LEGAL ANALYSIS

### I

■ Section 6–102 invalidates a possibility of reverter created before July 1, 1969, unless the grantor files a notice of intention to preserve it within a certain time period. R.P. § 6–102(a),(b). To preserve a possibility of reverter created between July 1, 1899 and June 30, 1969, the grantor must record the notice "not less than 70 years nor more than 73 years after the date of its creation." *Id.* § 6–102(e)(2). Thus, for a possibility of reverter created on November 5, 1921 (the date of the deed in this case), Knights would have had to record notice between November 5, 1991 and November 5, 1994.[2]

Knights admits that it did not record notice in the manner required by § 6–102. It asserts, however, that the action filed on March 5, 1993, served the purpose of the notice requirement of § 6–102, i.e., that the public be provided notice that the property was encumbered. Therefore, so the argument goes, the Board had "constructive and actual notice" of Knights' intention to preserve the possibility of reverter in the disputed acreage, and, accordingly, we should excuse the failure to follow the statutory prescription precisely.

■ We need not address this contention, for we find that § 6–102 does not apply in this case to extinguish the possibili-

---

**2.** We note that both parties stated the applicable dates incorrectly in their briefs. The date from which we calculate the limitations period is the date recorded on the deed, which is also mentioned in the circuit court's order granting summary judgment to the Board.

ty of reverter that Knights had owned. Knights could have filed a notice of intention up until 1994, and § 6–102(b) provides that "[t]he extinguishment [of the possibility of reverter] occurs *at the end of the period in which the notice or renewal notice may be recorded* and an estate in fee simple determinable ... then becomes a fee simple absolute." The language of the statute, therefore, provides that the possibility of reverter will not be extinguished until seventy-three years have passed from the creation of the fee simple determinable.

The statutory time period for extinguishing a possibility of reverter presupposes the continued existence of the possibility of reverter at least until the time period has expired. Of course, if the possibility of reverter no longer existed when seventy-three years had passed, then it could not be "extinguished"—it already would have been. We think, however, that is precisely what has happened in this case. The Court of Appeals illustrated the nature of the fee simple determinable estate in *Ringgold v. Carvel*, 196 Md. 262, 76 A.2d 327 (1950):

> "Thus, where land is devised for a certain purpose, and it is the testator's intention that it shall be used for that purpose only, and that on the cessation of such use, *the estate shall end without re-entry by the grantor*, a possibility of reverter arises ..."

*Id.* at 272, 76 A.2d 327 (emphasis added).

The Court of Appeals again examined possibilities of reverter in *Mayor of Ocean City v. Taber*, 279 Md. 115, 367 A.2d 1233 (1977), a case similar to this one. In that case, an 1878 deed conveyed a parcel of real estate to the United States for the sole purpose of establishing a Life Saving Station. *Id.* at 120, 367 A.2d 1233. In June 1967, the United States conveyed its interest in the land through a quitclaim deed; the trial court found that the conveyance conclusively established that the United States failed to use the Life Saving Station, as the deed required. *Id.* at 129, 367 A.2d 1233. The successors-in-interest to the original grantors had waited seven years to bring a claim for recovery based on this failure, but in holding

that the claim was not barred by estoppel, waiver, or laches, the Court of Appeals said:

> The 1878 deed divided the fee simple absolute estate in the property into the fee simple determinable estate conveyed by the Trustees and a possibility of reverter which remained in the hands of the Trustees. As we have observed, when the United States stopped using the property for a Life Saving Station, there was a diversion of the land from the purpose for which it was conveyed, *the estate held by the United States was determined, and automatically a fee simple absolute estate was reestablished in those entitled under the original grantors.* (Cited case omitted). It was not necessary for appellees to assert a claim to the fee simple absolute estate *or to take any other positive action. They acquired a fee simple absolute estate by the realization of the possibility of reverter.*

*Id.* at 131, 367 A.2d 1233 (emphasis added).

Although the Court in *Taber* noted that §§ 6–102 and 6–103 were not violated, we think the paragraph quoted above to be dispositive of the issue in this case. Quite simply, the cessation of using the land for a Colored Manual Training School determined the estate held by the Board, and a fee simple absolute estate *automatically* vested in Knights. No further action by Knights was required. *See id.* The *possibility* of reverter was realized—*ergo*, the possibility ceased to exist, giving way to ownership in fee simple absolute. *Id.* at 128, 367 A.2d 1233; *Ringgold*, 196 Md. at 272, 76 A.2d 327. If the possibility of reverter did not exist in 1994, then the expiration of the time period for filing a notice of intent to preserve the possibility could not destroy it.

The three-year window for filing the notice of intent serves at least two purposes. The seventy year "waiting period" for filing prevents grantors from filing the notice immediately after the grant, as a routine matter; thus, it ensures a careful evaluation of the worth of the possibility of reverter—the interest is worth preservation if its owner is willing to file a

notice of intent fully seventy years after its creation.[3] Second, the seventy-three year expiration period of a possibility of reverter protects the security of title by preventing long-irrelevant and antiquated conditions from operating to strip title from a subsequent grantee. The Special Committee on Possibilities of Reverter and Rights of Entry, formed in 1968 at the request of the Judiciary Committee of the Legislative Council for the purpose of researching the area and submitting the draft legislation for what would become §§ 6–102 and 6–103, phrased the policy considerations behind the recording requirement thusly:

> With the passage of time, the change of conditions in the restricted tract or in the neighborhood surrounding it, and the promulgation of government regulation, the usefulness of many [conditions subsequent or special limitations] has completely vanished. . . . When such losses of utility occur, seriously undesirable consequences follow. The owner of the restricted land cannot use it or develop it to the greatest advantage. He cannot find buyers for it, because no one wishes to take his place in the strait jacket. In most instances it is not practicable to obtain releases of the restrictions because the owners of the restrictions are numerous and scattered. In other instances, the restriction owners may be few and available, but hungry for their pound of flesh.
>
> In view of these undesirable consequences of the continued existence of restrictions which have lost their utility, the public interest in the marketability and full utilization of land requires that there be available to owners of parcels burdened with such restrictions economical and efficient means of getting rid of them.

---

3. The § 6–102(e)(3) requirement of notice renewal every twenty-seven to thirty years after the initial notice is recorded ensures a periodic evaluation of the worth of keeping the deed restriction alive. It also ensures practical ascertainment of the owners of the restrictions, so that the determinable estate holder may try to obtain a release. *See* Report of the Special Committee on Possibilities of Reverter and Rights of Entry, discussed *infra.*

██ We would not further these policies by applying § 6–102 to the facts of the case *sub judice*. The concern in this case is not with possibilities of reverter which, although alive on paper, are long-forgotten and dormant. Rather, this case deals with the attempt by Knights to obtain land in 1993 that it owned in fee simple absolute beginning, at the latest, in 1974. No possibility of reverter existed in 1993, so there was nothing to be extinguished by the operation of § 6–102.[4]

Furthermore, applying the Board's interpretation of § 6–102 would lead to an absurd result, which courts should strive to avoid. *See, e.g., Coerper v. Comptroller of Treasury*, 265 Md. 3, 6, 288 A.2d 187 (1972). If we were to adopt the Board's interpretation, then the following scenario could occur: a deed conveying a fee simple determinable estate is executed in 1968, with the grantor retaining a possibility of reverter. The determining event occurs in 1970, and the estate in fee simple absolute revests in the original grantor. According to the Board's application of the statute, even if the property were to change hands literally dozens of times over the years, whoever owned the property in the year 2038 would have to record, by the year 2041, a notice to preserve the possibility of reverter,

---

**4.** Because the Board makes no distinction in its brief between possibilities of reverter and rights of entry, we emphasize that a sharp distinction does in fact exist, and is embodied in the statute. *See* §§ 6–102 and 6–103. The distinction is crucial in this case. Specifically, the failure of a special limitation, such as a possibility of reverter, results automatically in the reversion of an estate to the original grantor in fee simple absolute without the need for entry. *Taber*, 279 Md. at 128, 367 A.2d 1233. The failure of a condition subsequent, however, merely gives rise to a right of entry; the grantor does not obtain a fee simple absolute until he or she enters and retakes the land. *See Harmon v. State Roads Com.*, 242 Md. 24, 42–43, 217 A.2d 513 (1966) ("No principle of law is more securely established than that which requires the enforcement of a breach of condition subsequent to be made by formal entry by the grantor, either by way of taking actual possession or by way of ejectment or some other appropriate legal proceeding."). Thus, if Knights merely had a right of entry due to the failure of a condition subsequent, then because it had not yet exercised that right by November 5, 1994, § 6–102 would have rendered the right of entry invalid.

or else this party would lose the reverter, and thus the property.

This result clearly is not what the legislature intended. The notice requirement of § 6–102 only applies to possibilities of reverter that exist at the time the grantor must record the notice. The proper focus here is on § 6–103, which imposes a seven-year statute of limitations on actions to recover property by reason of the termination of determinable fee-simple estates. The circuit court erred in deciding that § 6–102 barred Knights' action.

## II

We turn to the applicability of § 6–103 to the case *sub judice*. Section 6–103 reads, in relevant part:

No person may commence an action for the recovery of land, nor make an entry on it, by reason of a breach of a condition subsequent, or by reason of the termination of an estate of fee-simple determinable, unless the action is commenced or entry is made within seven years after breach of the condition or from the time when the fee-simple determinable estate terminates.

R.P. § 6–103.

Knights argues that § 6–103 does not apply in this case because of the automatic reversionary nature of a possibility of reverter. Because title to the land in fee simple absolute reverted to Knights immediately upon the closing of the school, so the argument goes, the prescriptive period of § 6–103 is irrelevant.

We disagree. Inherent in Knights' argument is the impression that § 6–103 deals with the *existence* of an estate, whether in fee simple absolute or fee simple determinable. Section 6–103, however, addresses two distinct and separate matters; it speaks to the time period within which a grantor must enter land or bring a recovery action upon the breach of a condition subsequent, and it speaks to the time period to do the same upon the termination of a fee simple determinable. One matter it does not address, at least expressly, is the question of ownership. We agree with the Board when it argues that Knights has confused having a fee simple absolute estate

reestablished in the original grantor upon termination of the fee simple determinable estate, and the need for the original grantor, after reestablishment of the fee simple absolute estate, to commence an action to recover the land within seven years after the termination of the determinable estate. The former is untouched by § 6–103. The latter, however, is controlled by it. *See Taber,* 279 Md. at 130, 367 A.2d 1233 (§ 6–103 prescribes a statutory limitation on the period within which actions may be brought and land recovered by reason of termination of determinable fee simple estates). The parties agree that the Board ceased operating the school in 1974. Knights presents no argument that the "discovery rule" should apply here to prevent the limitations period from beginning to run on that date. *See Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981) (a cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong). Thus, Knights would have had to file an action to recover the property by 1981. Plainly, Knights failed to satisfy the requirements of § 6–103, and the statute operated to time-bar Knights' action.

An anomaly in the statute, however, requires us to go even further in our resolution of this case.

■ As we have said, under the common law of title, Knights became the owners of a 100% fee simple absolute title upon the happening of the determinable event. This occurred no later than 1974. All of an absolute fee simple title in the whole of a property cannot be simultaneously in two completely separate unrelated title entities. Thus, at this point, the Board only had possession of the land, not title to it. The statute, R.P. § 6–103, requires the out-of-possession owner of a fee simple absolute title, acquired by a reversion resulting from the happening of a determinable event, to institute an action for possession within seven years or thereafter be prohibited from filing an action to claim possession, and from attempting to claim possession by "entry on it." This is what happened in the present case. Knights' failure to file its claim within seven years has foreclosed its present ability to main-

tain an action for recovery of land based upon the title that has reverted to it under the possibility of reverter. It is also forbidden to assert title by entry on it. Section 6–103 contains another important provision that, on its face, contributes to the anomaly arising out of this statute. The section's last sentence provides:

> Possession of land after ... termination of an estate in fee-simple determinable *is adverse and hostile from* ... the occurrence of the event terminating the fee-simple determinable estate.

(Emphasis added.) Thus, the Board's possession became adverse and hostile in 1974. Knights' right to file an action terminated seven years later, in 1981.

MARYLAND CODE ANNOTATED, CTS. & JUD. PROC. (C.J.) § 5–103(a) (1974, 1995 Repl.Vol.) provides for a general period of twenty years after which title by adverse possession matures unless an action for recovery of possession occurs or the owner enters the land. Thus, from 1981 forward, Knights could not lawfully file suit to redeem possession of the property. The Board's adverse possession had only been adverse for seven years; however, under the general language of C.J. § 5–103(a), a period of thirteen years remained in which Knights could not file suit but the Board had no title. Serious questions arise. Who has marketable title to the property for the thirteen years remaining under the general adverse possession statute? While the statute states that the owner may not reenter, what happens if a third party enters the property? How does the Board eject the third party? The Board ostensibly has no title and its possession has not yet ripened into title. For the answers to these questions and others, we look again to the statutory history of R.P. § 6–103 and to C.J. § 5–103.

The provisions here at issue were first enacted by the General Assembly in 1969 by Chapter 5 (House Bill 38) of the Laws of Maryland. The purpose clause stated, in relevant part, that it was declared to be a

matter of state policy that land is the basic resource of the economy and that any private arrangement which prevents its ... marketability and development ... is against the public interest; and that reverter or forfeiture provisions of unlimited duration ... interfere with the marketability ... and therefore constitute an unreasonable restraint on alienation and one contrary to the public policy of this state.

As originally enacted, what is now § 6–103 was directed to be codified as § 145 of Article 21. Thus, when we look to the legislative history, we shall be concerned primarily with that section.

Prior to 1969, a bill concerning reverter (H.B. 550 (1967)) had been proposed that was considered unconstitutional. As a result, the Judiciary Committee of the Legislative Council requested that a Special Committee study the need for legislation in this area. Ultimately, the Committee sent to the Legislature its "REPORT OF SPECIAL COMMITTEE ON POSSIBILITIES OF REVERTER AND RIGHTS OF ENTRY." In its extensive report, the Committee made several extremely relevant observations.

The problems created by special limitation ... are well known in Maryland ... [needed] development and use ... are barred by restrictions that cannot be extinguished. Desirable planning ... as well as wise use of urban property, is hindered by restrictions imposed at an earlier time.

In view of these undesirable consequences of the continued existence of restrictions which have lost their utility, the public interest in the *marketability and full utilization* of land requires that there be available ... economical and efficient means of getting rid of them.... The traditional common-law rules applicable to special limitations ... create ... a serious problem; where anachronistic restrictions cannot be extinguished judicially, land may remain undeveloped or limited to uneconomical uses, and its title becomes unmarketable.

> Substantial change ... is required to prevent an increasingly adverse effect on desirable community growth.

> .  .  .  .  .

> ... The restriction on use of land created by special limitations ... may go on forever.

(Emphasis added.) Later, in its report, the Committee discussed § 145 (now § 6–103) and recommended limiting the time within which the reverting owner could bring an action to "recover land." The Committee noted, as relevant to the specific issue we now address:

> While he [the person in possession under the determinable grant] may not have any subjective intent to hold adversely, this section ... ascribes an intent to him by making his holding adverse and hostile from the date of ... the termination of a fee simple determinable.

Speaking to what it perceived to be the problem with the law at that time, the Committee noted that, once a termination occurred, the person in possession (here, the Board) might no longer be in possession under "color of title."

> Even if the requisite possession, intent, and other elements for acquiring title by adverse possession can be made out, such possession *without color of title* would have to be for the period requisite for obtaining title by adverse possession without color of title. [20 years—*see* C.J. § 5–103.]

(Emphasis added.) The Committee thus pointed out that in the absence of its proposed § 145 (now R.P. § 6–103), a person in possession would have to remain in possession for twenty years after termination in order to establish title by adverse possession. The Committee then noted:

> Proposed section 145 attempts to accomplish a solution ... (2) it states that any actions or right of reentry will be barred if not instituted before the expiration of seven years ...; and (3) it *obviates concern over whether there is in fact an adverse holding over the period within which title can be acquired by a holder of a possessory estate who holds over after a ... termination of a determinable fee....*

... The statute should effectively limit the time within which future arising causes of action from ... the termination of determinable fees can be brought, *and thus serve to quiet title* and make them more marketable *at an earlier date.*

(Emphasis added.)

At about the same time, what is now C.J. § 5–103 (the adverse possession limitations statute) was changed to provide that "(2) this section does not affect the periods of limitations set forth in section 6–103 ... of Article 21...." Article 21, § 145, prior to the change in C.J. § 5–103, had been recodified as Article 21, § 6–103. The current C.J. § 5–103 thus updates the adverse possession limitations statute's deference to R.P. § 6–103.

■ Considering as a whole the comments and recommendation of the study Commission, the Legislature's public purpose statement contained in the original act, and the change in the adverse possession statute (now C.J. § 5–103) after the passage of then Article 21, § 145 (now R.P. § 6–103) to include the statement that it does not affect the period of limitation set forth in R.P. § 6–103, we hold that, under the circumstances here present, title by adverse possession vested in the Board (the fee simple determinable holder) seven years from the date of the happening of the determinable event in 1974. In other words, the Board acquired title by adverse possession in 1981. We further clarify our opinion and hold that, generally, when a fee simple determinable conveyance is made, the adverse possession of the grantee in possession begins to run on the date of the determinable event, and title in fee simple absolute vests by adverse possession seven years later.

### III

Knights argues that the lower court's application of §§ 6–102 and 6–103 violated the federal Constitution by impairing the obligation of contracts, divesting Knights of vested rights, and violating due process. Because § 6–102 does not apply in

this case, as discussed *supra*, we do not reach the question of its constitutionality. We will address whether the application of § 6–103 in this case is constitutional, however, as Knights presented the question in the circuit court and in this Court. MD. RULE 8–131(a) (1996).

■ The Constitution of the United States prohibits the states from passing any law impairing the obligation of contracts. U.S. CONST. art. I, § 10, cl. 1. The threshold inquiry in determining whether a law violates the Contract Clause is whether it "has operated as a substantial impairment of a contractual relationship." *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983); *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 20, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977); *State v. Good Samaritan Hospital, Inc.*, 299 Md. 310, 319, 473 A.2d 892, *appeal dismissed*, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984). If there is no impairment, then there is no constitutional infirmity.

■ Section 6–103 is a statute of limitations. *See Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 690, 404 A.2d 1064 (1979) (stating in *dicta* that § 6–103 is a legislatively-created exception to the general statute of limitations contained in § 5–101 of the Courts and Judicial Proceedings Article). A statute of limitations which simply affects a remedy does not destroy or impair vested rights. *Hill v. Fitzgerald*, 304 Md. 689, 702, 501 A.2d 27 (1985); *Baltimore County v. Churchill, Ltd.*, 271 Md. 1, 11, 313 A.2d 829, *appeal dismissed*, 417 U.S. 902, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974); *Allen v. Dovell*, 193 Md. 359, 363, 66 A.2d 795 (1949). The Court of Appeals enunciated the underlying analysis for this position in *Kelch v. Keehn*, 183 Md. 140, 144, 36 A.2d 544 (1944):

Statutes which do not destroy a substantial right, but simply affect procedure or remedies, are not considered as destroying or impairing vested rights, *for there is no vested right in any particular mode of procedure for the enforcement or defense of the right.*

*Id.* (emphasis added). As explained *supra,* however, R.P. § 6–103 shifts title to land by adverse possession. The Court of Appeals has explained the substantive effect of adverse possession:

"[The legal effect of adverse possession] is, not only to bar the remedy of the owner of the paper title, but to divest his estate, and vest it in the party holding adversely for the required period of time. . . . " So, without pursuing that question further, there can be no doubt that the running of the statute may not only affect the remedy of the holder of the paper title, but may extinguish his title, vest title in fee in the adverse holder. . . .

*Trustees of Sheppard & Enoch Pratt Hospital v. Swift & Co.,* 178 Md. 200, 208, 13 A.2d 174 (1940) (quoted source omitted). Thus, R.P. § 6–103 affects substantial rights.

The constitutionality of adverse possession statutes, however, is "no longer an open question." *Id.* Nevertheless, when a statute of limitation affects substantial rights, not just remedies, the operation of the statute is assumed to be prospective rather than retrospective. *Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.,* 308 Md. 556, 561–62, 520 A.2d 1319 (1987); *Beechwood Coal Co. v. Lucas,* 215 Md. 248, 253–54, 137 A.2d 680 (1958); *Kelch,* 183 Md. at 143, 36 A.2d 544. As noted *supra,* R.P. § 6–103 was first enacted in 1969 by Chapter 5 of the Laws of Maryland. The Board stopped operating the Colored Manual Training School in 1974. Thus, § 6–103 operated only prospectively in this case, because title to the land did not revert to Knights before 1974. Once it reverted, the seven-year adverse possession period set forth in R.P. § 6–103 began to run. The enactment of the statute did not operate to destroy any existing rights. The operation of the adverse possession

statute, enacted five years before a substantive right—and thus a right of action—existed, is constitutional.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**